Filed 5/4/26  P. v. Ware CA2/3

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | B338381 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. BA496865) |
| v. | |
| TERRANCE WARE, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eleanor J. Hunter, Judge.  Reversed and remanded.

Sydney Banach, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Charles Ragland, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Noah P. Hill and Thomas C. Hsieh, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted Terrance Ware of two counts of second degree murder. Ware raises numerous contentions on appeal, including the contention that the trial court failed to instruct the jury about how a defendant who is an initial aggressor can regain the right to self-defense. We agree with that contention and reverse the judgment and remand on that ground.

## BACKGROUND

I.    The murders of Rivera and Garcia

On July 2, 2021, at about 5:00 p.m., Luis Perez was with the victims Isaac Rivera and Christian Garcia and a few other men near Maple and Pico in downtown Los Angeles. The men were in an alleyway that led to a parking lot when Tameka Francis parked in the lot. Francis, however, left after refusing to pay for parking.

After Francis left, Rivera, Garcia, and a third man broke into her car and ransacked it. While they were in the car, Francis returned and told the men to get the " 'fuck' " out of her car. Garcia told her, " 'Shut up, bitch. I'm not done yet.' " Francis replied, " 'You're dead' " and said she was going to come back with her brother. Garcia got out of Francis's car with a speaker he was taking from it. Francis drove away in her car.

Perez left to smoke with a friend nearby. While smoking, Perez saw Francis walking with Ware and another man. Perez went to warn Rivera and Garcia, but he heard gunshots and saw Ware running away. As Ware ran away, he pointed a gun at Perez. Rivera pointed at Ware and said, " 'Bro, he shot me.' "

Brian Barrientos was near 12th and Maple when he heard gunshots and saw Ware holding a gun and running from where

2

the shots were fired. Perez was running after Ware and yelling, " 'It's him.' "

Garcia died at the scene, having been shot in his shoulder, twice in the chest area, and in his forearm. Rivera died at the hospital, having been shot once in the abdomen and once in the back. Stippling was on Garcia's body but not on Rivera's. The presence of stippling indicated the gun was less than four feet from Garcia's body.

Ware was arrested on July 7, 2021. He did not admit involvement in the shooting. Instead, he said they were checking on Francis's car when they heard gunshots, so they left.

II.     The crime scene and backpack

Law enforcement found six 9-millimeter casings at the crime scene but no weapons. Detective Alejandro Abundis, the investigating officer, testified that they found a backpack and that law enforcement does not touch or move evidence before taking photographs of it. When the detective saw the backpack, all of its zippers were closed. He could not recall if the backpack was "completely zipped," but it "was not open," meaning the contents could not be seen. The detective opened the backpack at the station and found a BB gun at the bottom.

However, photographs of the backpack at the crime scene appear to show the backpack open. After reviewing the photographs, Detective Abundis agreed that the backpack "could" have been open, but his recollection was that it was closed. On redirect examination, Detective Abundis said the BB gun was in the backpack's top portion, and a different part of the backpack, the front pocket, might have been open.

III. Evidence of threats to a witness

At trial, Perez said that he had previously testified in November 2022. While waiting in the court hallway, Ware's family members walked past him and one said, " 'I should slap the shit out of him right now.' " Perez felt threatened, so sheriff's deputies escorted him out a back way to his car. As Perez was driving out of the parking structure, a car blocked him, a woman came up to him, and she said, " 'Don't be snitching on me.' " Perez took it as a threat. As of the time of trial, he remained scared, stating, "They're stone cold killers over a $10 parking." He felt that testifying put his life in danger.

IV. Defense case

Francis, Ware, and a medical expert testified in the defense case.

A. *Francis's testimony*

Francis said she was in the area that day to shoot a music video. She and her friend parked in a lot and, after an incident with several men, she left. But as she left, one of the men said he was going to stab them.

Francis returned to her car to move it closer to the shoot. Two men were in her car, and she told them to get out. After moving her car, Francis called Ware and told him someone had broken into her car. Ware asked for her location in case she needed anything, but she did not tell him to come. However, Ware did come, and she told him that she was afraid the men had taken things from her car that had her address on it.

Ware, Francis, and their friend Hendrix walked back to the parking lot where Francis had originally parked her car to make sure the men did not have any information about where she lived.

4

After looking on the ground and not seeing anything, they started to walk back.  While in the alley, Francis saw one of the men, Garcia, who had been in her car.  Ware asked Garcia if he had been in Francis's car, and the men exchanged words that Francis described as "a little" hostile "but not too crazy."  According to Francis, Garcia was "saying that I was being rude to him and that I was coming for him or trying to attack him."  Francis then saw the second man who had been in her car, Rivera, and he was wearing a backpack that he took off.  Francis, with Ware following her, started to leave the alley, but when Rivera reached into the backpack, Ware told Francis to move.  She was walking away when she heard gunshots.  Ware ran past her, but he did not have a gun in his hands.  Francis never saw Ware with a gun.

Francis returned to the music shoot.  Later that night, she returned to her car and the police questioned her, but she did not mention hearing gunshots.

B.    *Ware's testimony*

Ware testified that he and Francis were friends, and he also managed her modeling career.  When Francis called him that day, she said that someone had broken into her car and "some guys were tripping."  He therefore went to her location because he was concerned and wanted to make sure she was okay.  Ware's friend Hendrix went with him.  Ware brought his loaded, unregistered gun, which he always carried because he tended to carry a lot of cash.

When Ware arrived at Francis's location, she told him that she wanted to make sure the men had not removed things from the car.  They went to where she had originally parked her car, but they did not find anything.  While in an alley off Maple, Ware saw gang graffiti.  The graffiti made him nervous, so he took his

gun from his satchel and put it in his pocket. He did not know if he would see the guys, but if he did, he did not know what their response would be.

After entering the alley, Ware saw Garcia, and Ware asked if he had been in Francis's car. During the minute or so conversation, Ware kept his hand on the gun in his pocket, although Ware said that any hostility or aggression lasted a "moment" but "simmered back down." Rivera then came into the alley on a bicycle. Rivera was "immediately irate" and yelling. Rivera took off his backpack, unzipped it, and put his hand inside. Garcia stuck his hands into his pants like he was trying to pull something out.

Ware told Rivera to calm down, and he backed away from Rivera and Garcia. Rivera, who was still straddling his bicycle, came towards Ware. Ware's "nerves" "immediately gone all the way up, and now I'm in fear." On seeing Rivera grab the handle of a gun, Ware began firing his gun. Ware estimated he was about 27 feet from Rivera and nine or 10 feet from Garcia when Ware fired his gun twice at Garcia and twice at Rivera. Ware then ran, not knowing if he hit anybody. He did not learn that Garcia and Rivera had died until after he was arrested.

Ware denied seeing Perez or pointing a gun at him.

Ware could not remember what he did with the gun after the shooting.

C.    *Medical expert*

The parties stipulated that Rivera had 0.6 nanograms per milliliter of blood of amphetamine and 2.5 nanograms per milliliter of blood of methamphetamine in his system at the time of his death. Dr. Ryan O'Connor, an emergency room doctor and forensic medical expert, testified that Rivera had "extremely high

levels" of methamphetamine in his system, between 50 and 250 times greater than the therapeutic range and "well into the abusive range," approaching a potentially fatal range.

The doctor explained that methamphetamine is a stimulant that causes a person to be hyperactive and fidgety, and to speak quickly. At higher doses, it can cause paranoid delusions and auditory hallucinations. "A hallmark of methamphetamine intoxication is rapidly alternating emotions[,] so you can be happy at one minute and then something happens maybe relatively unoffensive but you take it the wrong way and all of a sudden you're in a rage. Methamphetamine, especially in high doses is associated with anger and violent behavior and unpredictable behavior."

V. Verdict and sentence

The jury acquitted Ware of first degree murder and of assault with a semiautomatic firearm on Perez but convicted Ware of two counts of second degree murder with true findings on personal gun use allegations. (Pen. Code,[1] §§ 187, subd. (a), 12022.5. subd. (a).)

On June 3, 2024, the trial court sentenced Ware to consecutive terms of 15 years to life. The trial court did not impose punishment on the personal gun use allegations.

## DISCUSSION

Ware's defense was self-defense, and the trial court accordingly instructed the jury on perfect and imperfect self-defense. (CALCRIM No. 505.) Over Ware's objection, the trial

---

[1] All further undesignated statutory references are to the Penal Code.

7

court also instructed the jury with CALCRIM No. 3471 regarding an initial aggressor's right to self-defense.[2]  However, the trial court omitted language from CALCRIM No. 3471 about how an initial aggressor can regain the right to self-defense.  As we now explain, omission of that language was prejudicial error.

I.      The trial court's instructions and CALCRIM No. 3471

The People asked the trial court to instruct the jury with CALCRIM Nos. 3471 and 3472 because Ware first approached Garcia with a loaded gun.  The defense objected, arguing that there was no evidence Ware or Francis were the initial aggressors; to the contrary, the defense theory was Rivera was the initial aggressor.  The trial court noted the objections, but found that the evidence warranted giving the instructions.

The trial court instructed the jury with CALCRIM No. 3471, entitled "Right to Self-Defense:  Mutual Combat or Initial Aggressor," as follows:  "A person who starts a fight has a right to self-defense only if:  [¶]  1.  He actually and in good faith tried to stop fighting; [¶] AND [¶]  2.  He indicated, by word or by conduct, to his opponent, in a way that a reasonable person would understand, that he wanted to stop fighting and that he had stopped fighting.  [¶]  If the defendant meets these requirements, he then had a right to self-defense if the opponent continued to fight."

The trial court omitted the following language from CALCRIM No. 3471:  "[However, if the defendant used only non-deadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the

---

[2]      CALCRIM No. 3471 also instructs on mutual combat but the trial court omitted language about that theory.

8

fight, then the defendant had the right to defend (himself/herself) with deadly force and was not required to try to stop fighting(,/ or) communicate the desire to stop to the opponent[, or give the opponent a chance to stop fighting].]"

II.    General principles and standard of review

A trial court in a criminal case must instruct on the general principles of law that are closely and openly connected to the facts before the court and are necessary for the jury's understanding of the case. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1021.) This includes a sua sponte duty to instruct the jury on an affirmative defense if it appears the defendant is relying on such a defense or if substantial evidence supports it and it is not inconsistent with the defendant's theory of the case. (*People v. Boyer* (2006) 38 Cal.4th 412, 469; *People v. Ramirez* (2015) 233 Cal.App.4th 940, 949 (*Ramirez*).)

However, it is error to give an instruction that is not supported by substantial evidence. (*People v. Marshall* (1997) 15 Cal.4th 1, 39–40; *People v. Guiton* (1993) 4 Cal.4th 1116, 1129.) Substantial evidence is evidence of reasonable, credible value sufficient to deserve consideration by the jury. (*People v. Wilson* (2005) 36 Cal.4th 309, 331; *People v. Crew* (2003) 31 Cal.4th 822, 835.) "In determining whether the evidence is sufficient to warrant a jury instruction, the trial court does not determine the credibility of the defense evidence, but only whether 'there was evidence which, if believed by the jury, was sufficient to raise a reasonable doubt.' " (*People v. Salas* (2006) 37 Cal.4th 967, 982.)

Whether a trial court properly instructed a jury is a question of law that we review de novo. (*People v. Cole* (2004) 33 Cal.4th 1158, 1210.)

9

III.    Initial aggressors and the right to self-defense

Ware makes two arguments about CALCRIM No. 3471.  He first argues that it was inapplicable because there was insufficient evidence he was the initial aggressor.  Second, the trial court prejudicially erred by omitting language that he did not forfeit his right to self-defense in the face of sudden and deadly escalation.  As we now explain, there was substantial evidence to warrant giving the instruction, but the trial court erred in omitting language about when an initial aggressor regains the right to self-defense.

A.    *Substantial evidence*

Under CALCRIM No. 3471, an initial aggressor does not lose his right to self-defense if he actually and in good faith tried to stop fighting and conveyed to his opponent that he wanted to stop fighting and had stopped fighting, but the opponent continues to fight.  Ware argues that there was no evidence he was the initial aggressor; instead, "if anything, it was Rivera who was the initial aggressor."

To the contrary, the evidence showed that Francis threatened Garcia during their first confrontation.  She told Garcia, who had taken a speaker from her car, " 'You're dead,' " and said she would return with her brother.  Francis further admitted that she called Ware.  And although Francis and Ware denied that Francis asked him to come to her aid, the jury could reasonably infer that she asked him to come, given that she told the victims she would return with her brother, an apparent reference to Ware.

When Ware arrived, he was armed with a loaded gun and accompanied by another man, Hendrix.  (See *People v. Koontz*

10

(2002) 27 Cal.4th 1041, 1081–1082 [defendant's act of arming himself with loaded weapon was evidence of planning consistent with premeditation and deliberation finding].)[3] The three—Ware, Francis, and Hendrix—then returned to the parking lot, even though Francis's car was no longer parked there. Based on Francis's statements that she would return with her brother, the jury could reject Ware's and Francis's explanation that they returned to look for her things and believe instead that they were looking for the victims.

Moreover, Ware testified that he removed the gun from his satchel and put it in his pocket before he even saw the victims, which could suggest he was preparing for a confrontation. Indeed, Ware said he put the gun in his pocket because he did not know what the victims' responses would be if he encountered them. Francis and Ware both testified that when they encountered Garcia, Ware initiated a confrontation with Garcia, asking if he had been in Francis's car. Francis further testified that Garcia "was like … basically saying that I was being rude to him and that I was coming for him or trying to attack him." Ware and Francis admitted that the confrontation started a little hostile but simmered down. Ware further admitted he had his hand on his pocket containing the gun during the entire confrontation.

Based on this evidence, the jury could believe that Ware and his companions went looking for Garcia and Rivera to confront them and, on encountering Garcia, started a fight. The

---

[3] The jury here acquitted Ware of first degree murder. We therefore cite this authority to support the bare proposition that Ware's act of arming himself can show he planned for any encounter with the men who had fought with Francis.

evidence therefore was sufficient to warrant giving CALCRIM No. 3471. That the evidence might support or raise contrary inferences suggesting Rivera was the initial aggressor or was the one who started a fight does not render the evidence insufficient to support giving the instruction. (See *People v. Earp* (1999) 20 Cal.4th 826, 887–888 [stating the general sufficiency of the evidence standard of review].)

B.    *Forfeiture of right to self-defense*

Ware next contends that the trial court improperly excluded language from CALCRIM No. 3471 regarding his right to self-defense even if he was the initial aggressor.

As an initial matter, the Attorney General contends Ware forfeited this contention because he failed to ask the trial court to include the omitted language. (See *People v. Jennings* (2010) 50 Cal.4th 616, 671 [party may not complain on appeal that instruction correct in law and responsive to evidence was too general or incomplete in absence of request for clarifying language].) Assuming forfeiture applies, we nonetheless may decline to apply it if the instructional error affected the defendant's substantial rights. (§ 1259; *Ramirez, supra*, 233 Cal.App.4th at p. 949.) Because the contention affects Ware's substantial rights, we consider it.

As we have said, CALCRIM No. 3471 instructs that one who starts a fight has a right to self-defense if he tries to stop fighting and communicates to his opponent that he wants to stop fighting. However, the omitted language would have further told the jury that a defendant who starts a fight using "non-deadly force" does not lose the right of self-defense if the opponent responds with "sudden and deadly force." (CALCRIM No. 3471.) This language reflects the principle that when a defendant

12

engages in simple assault or trespass " 'and his opponent responds with deadly force so suddenly that the person cannot withdraw, a defendant may immediately use deadly force in self-defense.' " (*People v. Quach* (2004) 116 Cal.App.4th 294, 301 (*Quach*); accord, *People v. Conkling* (1896) 111 Cal. 616, 626–627; *People v. Hecker* (1895) 109 Cal. 451, 464 ["Where one is the first wrongdoer, but his unlawful act is not felonious, as a simple assault upon the person of another, or a mere trespass upon his property, even though forcible, and this unlawful act is met by a counter assault of a deadly character, the right of self-defense to the first wrongdoer is not lost"]; *Ramirez, supra*, 233 Cal.App.4th at p. 949; *People v. Gleghorn* (1987) 193 Cal.App.3d 196, 201.) The qualification in the omitted language thus "applies where the defendant commits a simple assault." (*People v. Salazar* (2016) 63 Cal.4th 214, 249.) But if " 'one makes a *felonious* assault upon another, or has created appearances justifying the other to launch a deadly counterattack in self-defense, the original assailant cannot slay his adversary in self-defense unless he has first, in good faith, declined further combat, and has fairly notified him that he has abandoned the affray.' " (*Id.* at p. 250 [exception did not apply where defendant approached victim with cocked gun].)

The Attorney General asserts that the trial court had no obligation to give the omitted language because there was no evidence Ware committed *any* assault, including a simple assault. However, a simple assault is an unlawful attempt, coupled with a present ability, to commit a violent injury on another. (§ 240.) Simple assault requires an act that by its nature would directly and probably result in the application of physical force to another person, and the crime does not require

13

actual physical injury or contact to the victim. (*People v. Harring* (2021) 69 Cal.App.5th 483, 503.)

Here, both Ware and Francis testified that Ware confronted Garcia by asking if he broke into Francis's car. Ware and Francis agreed that the confrontation was at least initially hostile and aggressive. And Ware kept his hand over his pocket with the gun in it during the entire confrontation. Garcia could interpret Ware's gesture of keeping his hand over his pocket during a hostile conversation as a physical threat,[4] especially when coupled with Francis's earlier threats to return with her brother and that Garcia would be "dead." There is evidence that this is exactly how Garcia interpreted the confrontation, because he accused Francis of "trying to attack him." If the victims responded to this nondeadly force with deadly force, then Ware could have regained the right to defend himself. Accordingly, there was sufficient evidence to warrant giving the omitted language.

We therefore consider whether the trial court's failure to give it was prejudicial. Courts of appeal have applied the harmless-beyond-a-reasonable-doubt standard in *Chapman v. California* (1967) 386 U.S. 18 to the error. (See, e.g., *Quach, supra*, 116 Cal.App.4th at p. 303 [applying *Chapman* standard where court gave erroneous self-defense instruction]; see *Ramirez, supra*, 233 Cal.App.4th at p. 953 [applying *Chapman* standard to failure to modify CALCRIM No. 3472].) The *Chapman* standard requires us to "determine whether it is clear beyond a reasonable doubt that a rational jury would have rendered the same verdict absent the error." (*People v. Merritt*

---

[4]    Indeed, Ware interpreted a similar gesture from Garcia, who Ware said put his hand down his pants, as threatening.

14

(2017) 2 Cal.5th 819, 831.)  We must reverse the conviction under that standard unless we conclude "that no 'rational juror who made the findings reflected in the verdict and heard the evidence at trial court could have had a reasonable doubt regarding the findings necessary to convict the defendant [absent the instructional error].' " (*People v. Schuller* (2023) 15 Cal.5th 237, 244.)

The error was prejudicial.  The evidence, while sufficient to support the second-degree-murder verdicts, could have also supported a theory that Ware responded to sudden and deadly force.  Ware testified that during his confrontation with Garcia, Rivera arrived on the scene, irate and yelling.  Rivera reached into his backpack and grabbed the handle of a gun.  Other evidence corroborated Ware's testimony.  Rivera had an extremely high level of methamphetamine in his system, which can cause a person to be violent, and he had a BB gun in his backpack.  And whether the backpack was fully closed or open was a subject of dispute at trial.  The jury also acquitted Ware of first degree murder, so it thereby rejected the prosecutor's theory that Ware was hunting the victims with the premeditated intent to kill them.  Given the evidence and verdicts, we are not convinced beyond a reasonable doubt that no juror would have found that the victims responded to nondeadly force with sudden and deadly force.

Nor was the omitted language inconsistent with Ware's defense.  An instruction is inconsistent with defendant's theory of case if it requires acknowledging, if only inferentially, existence of facts which defendant otherwise denied.  (*People v. Jo* (2017) 15 Cal.App.5th 1128, 1168–1169; *People v. Salas*, *supra*, 37 Cal.4th at p. 982–983 [trial court has no duty to instruct on

15

affirmative defense inconsistent with defendant's theory of case].) Ware did not deny the facts or evidence relevant to the omitted language. To be sure, his defense counsel argued in closing that Ware did not instigate anything, rather "he was looking around to make sure that these people weren't around when [Francis] came out, and he just wanted to let them know, look, is everything cool. He wanted to have a conversation," and he did not take out his gun. Ware thus certainly downplayed or put a favorable spin on the evidence surrounding his conduct in the alley, but he did not deny the facts and evidence. Instead, the defense provided many of the relevant facts: Ware initiated the confrontation, the confrontation was hostile, Ware kept his hand over his pocket containing the gun, and Garcia said he felt under attack.

Also, neither the defense nor the prosecution discussed the scenario of Garcia and Rivera interpreting Ware's conduct as threatening and the impact of such interpretation on any right to self-defense Ware might have had. The prosecutor only addressed when a "person starts a fight," saying such a person has a right to self-defense only if he actually and in good faith tried to stop the fight, which Ware did not do. While that was accurate, it was incomplete.

We further observe that the trial court did not (and was not asked) to expand on the meaning of "initial aggressor" (which phrase appears in the instruction's title) or "starts a fight," which is in the instruction's text. The jury thus would have applied a lay and commonsense definition to those terms based on the trial court's instruction that some "[w]ords and phrases not specifically defined in these instructions are to be applied using their ordinary, everyday meanings." (CALCRIM No. 200.) In everyday

16

parlance, an aggressor is one who commits or practices aggression. (Merriam–Webster's Collegiate Dict. (12th ed. 2025) p. 25.) Aggression is (1) "a forceful action or procedure (such as an unprovoked attack) especially when intended to dominate or master," (2) "the practice of making attacks or encroachments," and (3) "hostile, injurious, or destructive behavior or outlook especially when caused by frustration." (Merriam–Webster's Collegiate Dict. (12th ed. 2025) <https://www.merriam-webster.com/dictionary/aggression> [as of April 30, 2026], archived at <https://perma.cc/U5C9-73ND>.) The lay meaning of "initial" is first. Therefore, the combined meaning of the two words, i.e., "initial aggressor," is the first person who engages in aggression. While aggression certainly can refer to a confrontation with physical force, it also could refer to something short of that, for example, hostile behavior. We therefore cannot rule out that the jury believed that the confrontation Ware and Francis described made Ware the initial aggressor or that he started a fight.

Finally, we cannot find that the jury rejected the theory posed by the omitted language based on other instructions. The trial court included the language it omitted from CALCRIM No. 3471 in CALCRIM No. 3472. CALCRIM No. 3472 concerned contrived self-defense and it instructed the jury as follows: "A person does not have the right to self-defense if he provokes a fight or quarrel *with the intent to create an excuse to use force*. [¶] However, if the defendant used only nondeadly force, and the opponent responded with such sudden and deadly force that the defendant could not withdraw from the fight, then the defendant had the right to defend himself with deadly force and was not

17

required to try and stop fighting."[5]  (Italics added; see generally *Ramirez*, *supra*, 233 Cal.App.4th at pp. 947–949.)

Although CALCRIM No. 3472 contained the language omitted from CALCRIM No. 3471, we cannot be assured that the jury would have imported the exception for an opponent's sudden use of deadly force from CALCRIM No. 3472 into CALCRIM No. 3471.  Instead, CALCRIM No. 3472 applied in the limited situation where a defendant *intentionally* created an excuse to use force.  (See, e.g., *Ramirez*, *supra*, 233 Cal.App.4th at p. 957 [CALCRIM No. 3472's scienter requirement distinguishes it from CALCRIM No. 3471, which focuses on "whether inducement of a quarrel *leads* to an adversary's attack"] (dis. opn. of Fybel, J.).)  If the jury did not believe Ware intentionally created an excuse to use force, then it would not have even considered the exception pertaining to an opponent's unreasonable response, and nothing in the instructions otherwise suggested that the exception applied to CALCRIM No. 3471.

We therefore conclude that the error was prejudicial and requires reversal of the judgment.  Because we reverse on this ground, we need not address Ware's remaining contentions.

---

[5]  It is unclear why the trial court included the exception in CALCRIM No. 3472 but omitted it from CALCRIM No. 3471.

18

## DISPOSITION

We reverse the judgment and remand for further proceedings consistent with this opinion.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

EDMON, P. J.

We concur:

ADAMS, J.

HANASONO, J.